UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| Marcellous Walker, | : | Case No.: |
| Plaintiff, | : | **42 U.S.C. 1983 CIVIL RIGHTS** |
| | : | **COMPLAINT** |
| vs. | : | |
| Gary Boughton, Warden, Mark Kartmann, | : | |
| Lebbeus Brown, Sergeant Wallace, Matthew | : | |
| Scullion, Officer Hill, John and Jane Doe | : | |
| Officers, Nurse McCardle, John Doe | : | |
| Employer, Wisconsin Patient's Compensation | : | |
| Fund, | : | |
| Defendant. | | |

Plaintiff Marcellous Walker, pro se, complains and alleges the following:

## I. JURISDICTION AND VENUE

1.     This is a civil rights action authorized by 42 U.S.C. 1983 to redress the deprivation under color of state law, of rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. 1331 and 1343. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. 2201 and 2202.

2.     The Court has supplemental jurisdiction over Plaintiff's state law claims that arise under Wisconsin law, pursuant to 28 U.S.C. 1367.

3.     Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure.

## II.     PARTIES

4.     Plaintiff Marcellous Walker is currently confined at the Wisconsin Secure Program Facility (WSPF, hereinafter). During the events described herein he was confined at WSPF and housed on Alpha Unit. His address is 1101 Morrison Drive, P.O. Box 9900, Boscobel, WI 53805. Certain events in which Plaintiff Walker makes reference thereto had taken place while he was temporarily housed at the New Lisbon Correctional Institution (NLCI, hereinafter) and resided on the Restricted Housing Unit (RHU, hereinafter) under the premise of a segregation transfer.

5.     Defendant Gary Boughton is the Warden at WSPF and at all times relevant to this complaint was employed at WSPF. He is being sued in his individual and official capacities and may be reached at his place of employment at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

6.     Defendant Mark Kartmann is the Security Director at WSPF and at all times relevant to this complaint was employed at WSPF. He is being sued in his individual and official capacities and may be reached at his place of employment at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

7.     Defendant Lebbeus Brown is the Unit Manager of Alpha Unit at WSPF and at all times relevant to this complaint was employed at WSPF. He is being sued in his individual and official capacities and may be reached at his place of employment at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

8.     Defendant Sergeant Wallace is the first shift sergeant on Alpha Unit at WSPF and at all times relevant to this complaint was employed at WSPF. He is being sued in his individual capacity and may be reached at his place of employment at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

9.     Defendant Matthew Scullion is a lieutenant at WSPF and at all times relevant to this complaint was employed at WSPF. He is being sued in his individual capacity and may be

reached at his place of employment at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

10.     Defendant Officer Hill is a correctional officer at WSPF and at all times relevant to this complaint was employed at WSPF. She is being sued in her individual capacity and may be reached at her place of employment at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

11.     Defendant McCardle is a Nurse Practitioner at WSPF and at all times was employed by Defendant John Doe Employer to work under contract for the Department of Corrections at the WSPF. She is being sued in her individual capacity and may be reached at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

12.     Defendant John Doe Employer is a healthcare provider as defined under Wisconsin law, and is the employer of Defendant McCardle who works under contract at WSPF - and at all times relevant to this complaint was Defendant McCardle's employer. Defendant John Doe Employer is being sued for medical negligence under Wisconsin law. An address for John Doe Employer is not currently available to Plaintiff Walker.

13.     Defendant Wisconsin Patient's Compensation Fund may be reached at P.O. box 7873, Madison, WI 53707-7873. The physical address is located at 125 South Webster Street, Madison, WI 53703.

14.     Defendant John and Jane Doe Officers are unknown Correctional Officers at WSPF and at all times relevant to this complaint was employed at WSPF. They are being sued in their individual capacities and may be reached at their place of employment at 1101 Morrison Drive, P.O. Box 1000, Boscobel, WI 53805.

15.     At all relevant times each of the defendants acted under the color of state law.

### III.     FACTS

16.     On 12-03-17 after an incident involving a brief experiment with a hand-held noose earlier in the day (discovered during a cell search) Plaintiff Walker was placed in clinical observation

by Defendant Scullion. In mid-December, while at indoor recreation while housed on Alpha Unit, Plaintiff Walker discovered what he felt was an ideal means by which an inmate could take his own life if he chose: elevated positions in the Alpha Unit recreation areas where there were a sufficient number of anchor points by which one could secure a noose in order to hang himself.

17.    Plaintiff Walker began having serious thoughts of suicide - but it began to frighten him when he realized that he was actively searching for an adequate place to hang himself.

18.    This initial fear motivated Plaintiff Walker to send requests to Defendants Boughton, Scullion, Brown and PSU on 1-2-18 informing them of what he found to be an "irresistible means" by which an inmate could use to take his own life, inferring his own consideration and challenging Defendants Boughton, Scullion, Brown to fix them.

19.    On information and belief, on 1-9-18, an inmate near Plaintiff Walker noticed and had notified Officer Peckham that Plaintiff Walker hadn't eaten, showered, exchanged laundry or spoke to him in several days and he became concerned after recalling that Plaintiff Walker spoke of killing himself.

20.    On information and belief, Officer Peckham notified the unit shift sergeant, who then in turn notified PSU staff of these circumstances.

21.    Plaintiff Walker was seen by PSU staff (Ms. Lemieux) and she decided to place Plaintiff Walker on clinical observation status (OBS, hereinafter) after Walker disclosed to her that he didn't want to live and stopped eating or caring for himself.

22.    In addition, when Ms. Lemieux asked Plaintiff how he felt, he reported symptoms that included loss of appetite, dizziness, nausea and mental exhaustion.

23.    On 1-10-18 around noon, Ms. Lemieux appeared to interview Plaintiff Walker. When Walker disclosed to Ms. Lemieux that he began eating again, she arranged for him to see health services staff for his previously reported symptoms and that he was being released from OBS status.

24.    Plaintiff Walker was escorted from the interview booth to the Alpha Unit medical exam room by two officers.

25.     Upon entering the exam room, Defendant McCardle N.P. motioned for the escorting officers to direct Walker to the scale to weigh him. Afterward Plaintiff Walker was seated so that he could be examined by McCardle.

26.     Defendant McCardle asked Plaintiff Walker what were the symptoms that he reported to Ms. Lemieux that seemed to have caused her concern.

27.     Plaintiff Walker reported to Defendant McCardle that he felt hopeless, had a loss of appetite, dizziness, nausea and mental exhaustion. Walker added that he did not believe that these symptoms were of a medical nature.

28.     Defendant McCardle ignored Plaintiff Walker's suggestion and proceeded with a preliminary physical examination, listening to and feeling the areas of or related to Walker's gastrointestinal tract – searching for abnormalities or obstructions which she explained to Walker as she proceeded.

29.     After her preliminary examination, Defendant McCardle informed Plaintiff Walker that he might have a stomach virus. Noting Plaintiff Walker's frailty, Defendant McCardle prescribed a nutritional supplement (Boost), a liquid antacid (Rulox) and a drug for nausea (Ondansetron 8mg) three times daily.

30.     After the appointment, Plaintiff Walker was returned to his prior status and placed back in his regular segregation clothing and cell #305. Once his prescription was filled, Walker took Ondansetron as prescribed before each meal due to his ongoing issues with nausea, up until February 22, 2018.

31.     At no time did Defendant McCardle inform Plaintiff Walker of any risks or potential side effects of Ondansetron 8mg.

32.     At no time did Defendant McCardle ask Plaintiff Walker about any drugs which he was currently prescribed. Nor did she mention any precautions he should take regarding the use of Ondansetron with other drugs.

33. At no time prior to 2-19-18 had McCardle or any HSU staff provided Plaintiff Walker with any written information or insert identifying risks, side effects or drug interactions while taking Ondansetron 8mg.

34. In the following days, Plaintiff Walker wrote follow-up requests to Defendants Boughton, Scullion, Brown and PSU seeking a response to his unanswered requests sent 1-2-18 concerning the "irresistible means" by which an inmate could use to take his own life in certain Alpha Unit recreation areas.

35. By 1-17-18 Plaintiff Walker received a response to his 1-2-18 request from Defendant Boughton acknowledging his ideations of self-harm and need for PSU engagement.

36. On the afternoon of 1-17-18, Ms. Lemeiux stopped at Plaintiff Walker's cell door while distributing puzzles and crosswords and asked Walker how he felt. Walker stated "the same" meaning he still wanted to die.

37. After the normal line of questioning, Ms. Lemeiux told Defendant Walker that he would be seen by clinical but did not disclose a date, how soon or whom Walker would be seeing.

38. The following day, on 1-18-18 around 1:15 p.m. Plaintiff Walker met again with Ms. Lemieux.

39. After inquiring about Walker's methods for dealing with anxiety and rumination, family issues and routines – she asked Walker if he would like to go to another facility, among other things.

40. Once Plaintiff Walker was returned to his cell, an officer appeared at his cell door and told him to pack his property and informed Plaintiff that he was being transferred the next day to the New Lisbon Correctional Institution (NLCI) as part of a *trial* segregation transfer.

41. The next day on 1-19-18, Plaintiff Walker was transported to NLCI along with three (3) other WSPF segregation unit prisoners and their property.

42. The suddenness of this transfer caused Plaintiff Walker great distress and anxiety in addition to his ongoing serious mental health condition.

43. Plaintiff Walker was not told why or how he was selected for transfer, nor had he received any formal notice of how long he would be there or who made the determination to send him, however, on information and belief, Defendant Boughton, Kartmann and Brown arranged or approved of this transfer.

44. On 1-22-18 Plaintiff Walker participated in a routine reception and screening and Prison Rape Elimination Act (PREA) questionnaire with the Restrictive Housing Unit (RHU) psychologist. This was Plaintiff Walker's only contact with NLCI PSU.

45. Shortly after arriving at NLCI, Plaintiff Walker began regularly taking his prescription of Mirtazipine 15mg to aid him in sleeping, as he was unable to get adequate sleep due to his chronic anxiety.

46. After about one (1) week while confined at NLCI and housed on RHU, Plaintiff Walker began seeing and feeling ants crawling on him and in his cell. He also began seeing and talking to Jesus.

47. After about one (1) week while confined at NLCI and housed on RHU, Plaintiff Walker began experiencing a sudden onset of hangover-like headaches, delirium and constipation.

48. The sightings and interactions Plaintiff Walker had with Jesus and the ants and the sudden onset of hangover-like headaches, delirium and constipation began shortly after Plaintiff Walker began taking Ondansetron 8mg.

49. As Plaintiff Walker had not been apprised of any of the potential risks or side-effects of Ondansetron 8mg, by this time, Plaintiff Walker had not attributed his symptoms to the drug and therefore did not stop taking the drug or report his new symptoms to health services staff for fear of being charged a $7.50 co-pay which inmates are regularly charged for HSU services which do not suggest follow-up care for a previously treated matter, or inasmuch an ongoing medical problem.

50. Plaintiff Walker needed his funds for deodorant, lotion and for postage so that he could return an inmate's legal papers to him.

51.     When NLCI health services staff had seen Plaintiff Walker for a weight check, he informed the nurse that he was experiencing several of these symptoms.

52.     The NLCI nurse's response was for Plaintiff Walker to complete and submit a health services request.

53.     On information and belief, at no time was Plaintiff Walker being monitored, nor was there any order issued by McCardle or any other HSU staff that he be monitored  for any potential symptoms or side-effects resulting from his prescription of Ondansetron 8mg.

54.     On information and belief, though he was aware of Plaintiff Walker's serious mental health needs, Defendant Boughton arranged or approved of Plaintiff Walker's temporary transfer but failed to fully apprise the receiving institution of Plaintiff Walker's serious ongoing mental health needs, nor had he delegated such responsibility to another to do so.

55.     On 2-16-18 Plaintiff Walker was transferred back to WSPF and continued seeing and speaking to what he thought was Jesus, whom Walker believed was prodding him to move forward with his idea to take his life, which Walker then seriously began to plan.

56.     Over the weekend during med pass, Plaintiff Walker noticed what appeared to be a sandwich bag on the med cart with his name-tag on it.

57.     Inside of the bag was what appeared to be instructional inserts; so he asked for them.

58.     Staff handed them to Plaintiff Walker and upon closer inspection, Walker discovered that they were in fact informational inserts (three of them) for his Ondansetron 8mg prescription, which he hadn't read until a few days later, after lunch, but just prior to rec on 2-19-18.

59.     On 2-18-18 Plaintiff Walker was asked by staff if he wanted to attend outside recreation which was scheduled for the following day (2-19-18) to which Walker stated that he did.

60.     On the morning of 2-19-18, Plaintiff Walker was informed by C.O. Peckham that he would be taken to recreation after lunch.

61.     Even after nearly documenting his entire segregation stay and partially reading the medication inserts he recently acquired, Plaintiff Walker was convinced that Jesus had again appeared to him and pressed Plaintiff to "*come to*" him.

62.     C.O. Peckham and C.O. II Hill appeared at Walker's door to restrain, search and escort him to recreation. Walker was restrained with handcuffs and a waist restraint and Defendant Hill conducted a sloppy pat search of Walker, barely touching him and not searching the areas inside, over his shoulders or underneath his arms.

63.     Prior to being taken from his cell, Plaintiff Walker made two (2) slip knot loops with a prison bed sheet and slid each loop over each of his arms and around his shoulders, with the knots facing down in his armpit areas; the thick band of remaining sheet slung behind his back "*toga-style*" beneath a t-shirt and a loose fitting state sweatshirt.

64.     On information and belief, had Defendant Hill *properly* searched Plaintiff Walker, she would have discovered the noose that Plaintiff Walker had looped around his arms and eventually hung himself with.

65.     Plaintiff Walker was the escorted to Range 1 and placed in the rec cage second from the end.

66.     Each range hallway leads to two rec cages with the exception of Range 4, which leads to only one (1) rec cage.

67.     There are seven individual (7) rec cages in the Alpha Unit outside rec areas.

68.     There are two (2) security cameras inside of each rec cage for a total of fourteen (14) video cameras. On information and belief, there are also other security cameras on the outside perimeter of the Alpha Unit rec cages with the rec cages in clear view.

69.     In these rec cages, inmates who are on disciplinary separation status are placed in separate rec cages.

70.     The only inmates who are authorized to be placed in a rec cage with another inmate are inmates who are on administrative confinement and who are on "green phase".

71.     Plaintiff Walker was on disciplinary separation status, Step II, so he was placed in a rec cage alone.

72.     Three (3) other inmates were taken out to recreation with Walker, however none were placed in the rec cages immediately flanking either side of Plaintiff Walker's, however, Walker believed that each of these inmates were administrative segregation inmates.

73.     On information and belief, it was under 35° outside at the time Plaintiff Walker was taken out and it was also raining.

74.     Shortly after Plaintiff Walker was taken outside his canvas shoes and socks became soaked and he became nervous about the prospect of his committing suicide.

75.     There is an intercom in each Alpha Unit outside rec cage. The speaker/mic on the intercom system makes a distinctive click or pop sound when turned on and off – both when staff *pick up* answer a call and *hang up* to end one.

76.     The intercom does not make this sound after staff answers a call and await the inmate's explanation for calling.

77.     After some minutes passed, Plaintiff Walker pressed the call button on the intercom in his rec cage, and on information and belief, Defendant Sergeant Wallace answered.

78.     Defendant Wallace asked Plaintiff Walker *"What is it?"*, Plaintiff Walker then told Defendant Wallace that his feet were wet and cold and that he wanted to be brought in from outside rec.

79. Defendant Wallace replied "You chose to go out and now you gotta live with it."

80. Since Plaintiff Walker did not hear the distinctive pop or click sound which would have indicated that Defendant Wallace was no longer able to hear him, Walker said, "So I guess you want me to wait for second shift."

81. Defendant Wallace responded, "*If they wanna bring you in, that's up to them.*"

82. Plaintiff Walker had still not heard the click or pop sound indicative of a hang up. So with the full understanding that staff would have to immediately respond to inmate threats of self-harm, Plaintiff Walker loudly claimed that he was going to kill himself into the intercom.

83. It was at this time that the intercom clicked, which indicated to Walker that Defendant Wallace ended his ability to hear Walker, but indeed heard Walker's threat of self-harm and was sending someone to respond to Walker's threat to kill himself.

84. At this point, Plaintiff Walker assumed that unit staff were on their way to restrain him and escort him back into the building to place him on clinical observation status, but as many minutes passed - no one ever came.

85. After several minutes more passed, again Plaintiff Walker saw the face of who he thought to be Jesus and it told Plaintiff Walker "*Come to me*", which Plaintiff Walker took as an omen to follow through with his threat to kill himself.

86. On information and belief, during the exchange between Plaintiff Walker and Defendant Wallace, Defendant Hill heard Plaintiff Walker's request to be brought indoors and the threat to kill himself.

87. Shortly thereafter, Plaintiff Walker unraveled the makeshift nooses from his arms, placed the noose around his neck, scaled the corner of the rec cage (*which was in clear view of the security cameras*), anchored a knotted loop through the fence on the post between 12-14 feet from ground level and then hung himself from the fence.

88. Before losing consciousness, Plaintiff Walker recalled hearing inmate voices calling for help and the faint voice of John Doe Officer responding to one of the inmates over the intercom.

89.    There are video monitors in the sergeant cage on Alpha Unit which have a view of each of the Alpha Unit outside rec cages.    (continued on next line)

⠀⠀⠀⠀⠀On information and belief, John Doe Officer who responded over the intercom was the officer in the sergeant cage on Alpha Unit, and had answered the call from the inmate in the rec cage because John Doe Officer himself had not yet noticed Plaintiff Walker dangling by his neck from the rec cage when he responded to the inmate who was calling him over the intercom for help.

90.    At one point, Plaintiff Walker tried scraping and clawing his way back up the fence in an attempt to save himself, but could not.

91.    As Plaintiff Walker gagged and gasped for air, he began to lose strength in his fingers and arms and lost consciousness.

92.    On information and belief, as WSPF is a maximum security prison, (*formerly known as Supermax*) anytime inmates are attending outside recreation or are in common areas outside of their quarters, John and Jane Doe Officers are required to supervise and monitor inmates with due diligence, but were not doing so when Plaintiff Walker ascended the fence and hung himself.

93.    On information and belief, minutes after Plaintiff Walker hung himself; first responders were summoned, but ran to several different ranges/tiers (Range 4, 3 and 2) all before running to the range that led to the rec cage leading to Plaintiff Walker's rec cage on Range 1.

94.    On information and belief, first responders responded to all the wrong rec cages (in part) because the Alpha Unit rec cages were not adequately marked so that staff could quickly and effectively identify and direct staff to an inmate emergency taking place in the Alpha Unit rec cages.

95.    On information and belief, minutes passed while staff was having difficulty pinpointing Plaintiff Walker's location, running up and down various hallways and corridors in confusion.

96.    On information and belief, it was Defendant Boughton, Kartmann and Brown's responsibility to ensure that the common areas for inmate activities were clearly marked so that

prison staff could quickly identify and direct staff to inmate emergencies at the WSPF and on the Alpha Unit.

97. On information and belief, by the time first responders reached Plaintiff Walker, he had been unconscious for several minutes.

98. On information and belief, had an inmate *not* notified staff that Walker was hanging from the fence, Plaintiff Walker would have lost his life - hanging from a fence which was in plain view of security cameras, a perimeter patrol vehicle and the lobby/gatehouse.

99. On information and belief, once at Plaintiff Walker's location, first responders had difficulty mounting a rescue effort that did not further harm Plaintiff Walker, as he was informed that he was being choked due to inadequate tools which staff used to get him down from the fence.

100. On information and belief, Plaintiff Walker was eventually cut down, laid on the ground and after several moments, began gasping and sucking in air. Walker was then placed upon a gurney and transported to a waiting ambulance, which then took him to the ER.

101. Upon his arrival at the ER, Walker was treated, diagnosed with severe depression and after nearly six (6) hours, was returned to WSPF with orders for close observation.

102. Upon his return to WSPF, Plaintiff Walker was placed on clinical observation status, continuing his prescribed medications, including Ondansetron 8mg, three (3) times daily.

103. The following day, on 2-20-18, Defendant Hill saw Plaintiff Walker at his door (Cell #405) and stepped to the side of it, speaking into the gap in the side of the observation cell door.

104. Defendant Hill stated to Plaintiff Walker that she felt bad about not finding the sheet before he hung himself.

105. After Plaintiff Walker informed Defendant Hill that he called up and told Defendant Wallace that he was going to kill himself, Defendant Hill informed Plaintiff Walker that she was at the officer station alone with Defendant Wallace when Walker called over the intercom.

106.  Defendant Hill then stated that she was in a rush to write an incident report on an unrelated matter when Plaintiff Walker called over the intercom and would have brought Walker in from outside, but also stated that she was in a rush to get home. She then left.

107.  Had Defendant Hill not provided Plaintiff Walker with the information which she did, Walker would not have had any other way of knowing this.

108.  On the same day of 2-20-18, Plaintiff Walker was visited by Ms. Lemieux and later, Defendant McCardle. Plaintiff Walker informed Defendant McCardle about what might have been hallucinations he experienced leading up to him hanging himself.

109.  Defendant McCardle directed Plaintiff Walker to speak with Nurse Practitioner Psychiatrist Kirsch about the hallucinations.

110.  Defendant McCardle further informed Plaintiff Walker that though she herself in private practice worked both as a medical and psychiatric nurse practitioner, that she was only able to operate as one or the other while under contract with the WDOC.

111.  Even after Plaintiff Walker noted that what he experienced might have resulted from her recent prescription of Ondansetron, Defendant McCardle insisted that Plaintiff Walker direct his medical concern to Nurse Practitioner Psychiatrist Kirsch.

112.  On 2-21-18, when Plaintiff Walker visited with Nurse Practitioner Kirsch, he reported what might have been hallucinations possibly linked to his Ondansetron prescription.

113.  N.P. Kirsch suggested a number of different psychotropic drugs to counter Plaintiff Walker's reported symptoms, dismissing his suspicions and concerns of side effects or adverse reactions to a current prescription.

114.  Plaintiff Walker agreed to try the proposed treatments, but only if they could first investigate and rule out whether current medications were causing any of his reported symptoms, so Plaintiff Walker requested an updated monogram of all current and proposed meds and received the monogram on 2-22-18 after being removed from OBS status.

115.  On 2-22-18, around 3 pm, Plaintiff Walker was released from OBS and he stopped taking Ondansetron on his own due to his previous suspicions and recent information provided to him.

116.    Since 2-24-18, Plaintiff Walker has had few headaches, no constipation or delirium, nor had he experienced what might have previously been hallucinations of ants crawling on him, or seeing and hearing Jesus urging him to kill himself.

117.    Even after reporting these symptoms and potential side effects to Defendant McCardle, Ms. Lemieux and HSU staff, by the time of the Plaintiff's completion of this civil complaint, the prescription for Ondansetron had still not been discontinued, no monitoring regiment for potential symptoms had been scheduled and the drug continued to remain readily available for Plaintiff Walker's use.

118.    Since his suicide attempt, Plaintiff Walker has continued to suffer from significant nerve and muscle pain in his neck and continues to receive ongoing treatment for such.

## IV.    EXHAUSTION OF LEGAL REMEDIES

119.    Plaintiff Walker used the Inmate Complaint grievance process to seek redress for his injury. On 2-22-18, Plaintiff Walker presented facts relating to his complaint concerning Defendant Hill failing to conduct a proper pat search of him. On 2-23-18 Mr. Brown, ICE, informed Plaintiff Walker that because his complaint alleged staff misconduct, it must be investigated by a Security Supervisor. A recommendation to dismiss the complaint with modification was made on 2-26-18. Defendant Boughton followed the recommendation and issued a decision dismissing the complaint with modification on 2-27-18. (See Exhibits C-001 thru C-005)

120.    Plaintiff Walker used the inmate Complaint grievance process to seek redress for his injury. On 2-22-18, Plaintiff Walker presented facts relating to his complaint concerning Defendant Wallace and Defendant Hill failing to respond to his threat of self-harm. On 2-23-18, Mr. Brown, ICE, informed Plaintiff Walker that because his complaint alleged staff misconduct, it must be investigated by a Security Supervisor. A recommendation to dismiss the complaint with modification was made on 2-26-18. Defendant Boughton

followed the recommendation and issued a decision dismissing the complaint with modification on 2-27-18. (See Exhibits C-006 thru C-010)

121. Plaintiff Walker used the Inmate Complaint grievance process to seek redress for his injury. On 2-23-28, Plaintiff Walker presented facts relating to his inmate complaint concerning staff unpreparedness and delay in responding to his emergency (hanging). On 3-5-18 the ICE recommended that Plaintiff Walker's complaint be dismissed, but noted that due to one of the causes of the delay in staff responding to his emergency - changes were made to the Alpha Unit recreation cages. On 3-7-18 defendant Boughton followed the recommendation and issued a decision dismissing the complaint. The decision was appealed to the CCE and a decision was issued by the OOS on _____. (See Exhibits C-011 thru C-017)

122. Plaintiff Walker used the Inmate Complaint grievance process to seek redress for his injury. On 3-1-18, Plaintiff Walker presented facts relating to his inmate complaint concerning Defendant McCardle not providing him with information by which he could use in order to give informed consent to treatment, failing to apprise Plaintiff Walker of the risks and potential side effects of Ondansetron 8mg. On 3-15-18, J. Payne, ICE recommended that Plaintiff Walker's complaint be dismissed. On 3-21-18, the Reviewing Authority, L. Doehling followed the recommendation and issued a decision dismissing the complaint. The decision was appealed to the CCE and a decision was issued by the OOS on _____.(See Exhibits C-018 thru C-024)

123. Plaintiff Walker used the Inmate Complaint grievance process to seek redress for his injury. On 2-23-18, Plaintiff Walker presented facts relating to his inmate complaint concerning him not being provided with treatment or assessment to determine a cause and adequate course of mental health treatment. (See Exhibits C-025 thru C-031)

124. Plaintiff Walker used the Inmate Complaint grievance process to seek redress for his injury. On 3-1-18, Plaintiff Walker attempted to present facts relating to his complaint concerning his notifying Defendants Boughton, Scullion and Brown of potential

dangerous anchor points in certain Alpha Unit rec areas and their failure to assess and address the general areas after being given such prior warning. On 3-1-18, the complaint was returned to Plaintiff Walker with a letter from E. Ray ICE, stating that Plaintiff was barred from filing more than two complaints per week and that said complaint did not meet the exceptions provided under DOC 310.09(2). The following week, on 3-6-18 Plaintiff Walker refiled the complaint and it was rejected on the basis of being untimely, as it was beyond the (14) calendar day limit, though it was originally filed within those limits. Plaintiff Walker appealed the decision to the Reviewing Authority, Defendant Boughton (a person named in said complaint) and he decided that the complaint was properly rejected by the ICE on 3-12-18. (See Exhibits C-032 thru C-037)

## V.      LEGAL CLAIMS

125.    Plaintiff Walker re-alleges and incorporates by reference paragraphs 1 thru 125.

126.    Plaintiff Walker's risk of suicide was a serious medical need for the purposes of the Eighth Amendment.

127.    Defendants Boughton, Kartmann and Brown knew of or should have known Plaintiff Walker's risk of suicide and were deliberately indifferent to Plaintiff Walker's high risk of suicide when they arranged and/or approved of Plaintiff Walker's transfer to NLCI RHU without making adequate arrangements for, or apprising the receiving facility of Plaintiff Walker's ongoing need for continued intervention due to his ongoing mental health condition which put him at risk of suicide - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

128.    Defendants Boughton and Brown were deliberately indifferent to Plaintiff Walker's safety by failing to assess and address *all* Alpha Unit rec areas after Walker informed them of specific dangers in certain Alpha unit rec areas – violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

129.     Defendants Boughton, Kartmann and Brown were deliberately indifferent to Plaintiff Walker's safety by failing to have adequate search training, policies and procedures in place which would have allowed Officer Hill to identify that Plaintiff Walker had a prison bed sheet looped and knotted around his shoulders prior to his being escorted to the Alpha Unit outside rec cages - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

130.     Defendants Boughton, Kartmann and Brown were deliberately indifferent to Plaintiff Walker's safety by failing to have adequate training and tools in place which would have allowed first responders to quickly identify and direct a timely intervention in Plaintiff Walker's suicide attempt - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

131.     Defendant Hill was deliberately indifferent to the safety of Plaintiff Walker by failing to conduct a proper search of his person prior to escorting him to Alpha Unit outside recreation - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

132.     Defendants Wallace and Hill were deliberately indifferent to the health and safety of Plaintiff Walker when 1.) Walker requested to come in from outside recreation when he informed them that he was wet and cold and left him outside, and 2.) after Walker threatened to kill himself, did not reasonably respond - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

133.     John and Jane Doe Officers recklessly disregarded the safety of Plaintiff Walker and others when they failed to supervise and monitor the Alpha Unit rec cages which resulted in Plaintiff Walker successfully ascending the fence, attaching a noose and hanging himself, causing him pain, injury and near death - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

134.     Plaintiff Walker had a state law right to give informed consent to any proposed medical treatments.

Case 2:18-cv-00612-WCG   Filed 04/18/18   Page 18 of 23   Document 1

135. Plaintiff Walker was prescribed Ondansetron 8mg by Defendant McCardle N.P.

136. While prescribed Ondansetron 8mg, Plaintiff Walker was also prescribed Mirtazipine 15mg.

137. If Plaintiff Walker was made aware that the risks of taking Ondansetron 8mg was hallucinations, delirium, headaches and death, he would not have consented to the proposed treatment.

138. The risk of hallucinations and death were elevated with the Plaintiff's use of Mirtazipine.

139. Once Plaintiff Walker did become aware of the potential link between his hallucinations and Ondansetron, he had difficulty making any distinction between what may have been divine intervention and reality.

140. If Plaintiff Walker was aware that the risk of hallucinations and death were elevated with the use of Mirtazipine, he would not have consented to the proposed treatment.

141. Defendant McCardle did not provide Plaintiff Walker with information which would have allowed him to make an informed decision about her proposed treatment.

142. Defendant McCardle did not apprise Plaintiff Walker of reasonable alternatives to the proposed treatment or diagnostic techniques used to conclude a diagnosis.

143. Defendant McCardle's prescription of Ondansetron caused or aggravated the Plaintiff's condition, resulting in the harm and near death of Plaintiff Walker.

144. Defendant McCardle was deliberately indifferent to the health and safety of Plaintiff Walker when 1.) Walker informed her that he believed his symptoms were due to psychological issues she ignored him and prescribed Ondansetron 8mg to treat his nausea, 2.) she did not apprise or inform Walker of the potential side effects or risks (hallucinations, delirium, headaches and death) and 3.) she failed to establish a monitoring regiment for Plaintiff Walker and inform him of certain drug interactions and the elevated risks of side effects and death while also taking Mirtazipine - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

145.    Defendant McCardle was deliberately indifferent to the health and safety of Plaintiff Walker when after he informed her that he was experiencing hallucinations when he attempted to kill himself only a day earlier, instead of considering the cause of his symptoms, she deferred him to the psychiatrist nurse practitioner and continued his Ondansetron prescription - violating his rights under the Eighth Amendment to the United States Constitution and caused him pain, injury and near death.

146.    Defendant John Doe Employer is a *"health care provider"* as defined under Wis. Stats. 655.002 and is liable for negligent training, retention and supervision in Defendant McCardle's failure to inform Plaintiff Walker of the risks and potential side effects of Ondansetron 8mg, 2.) failure to inform Plaintiff Walker of the elevated risks of Serotonin Syndrome when Ondansetron 8mg is taken while also taking Mirtazipine, 3.) failure to apprise Plaintiff Walker of reasonable alternatives to the proposed treatment and diagnostic techniques upon which McCardle prescribed and 4.) failure to establish a monitoring of Plaintiff Walker for symptoms related to his use of Ondansetron – violating his right to informed consent and constituting medical negligence under Wisconsin law, resulting in his injury, pain, hallucinations and near death.

147.    Defendant Wisconsin Patient's Compensation Fund is the supplemental insurer for defendants in medical malpractice suits in the State of Wisconsin and is liable for any award of damages which exceed the amount covered by the defendant health care provider's primary insurance coverage for medical malpractice claims.

148.    The Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiff Walker has been and will be subject to irreparable harm by the conduct of the defendants unless the Court grants the declaratory and injunctive relief he requests.

## VI.    PRAYER FOR RELEIF

WHEREFORE, Plaintiff Walker respectfully pray this Honorable Court enter judgment

1.    Granting Plaintiff Walker a declaration that the acts or omissions described herein by the defendants violate his rights under the Constitution and laws of

the State of Wisconsin and under the Constitution and laws of the United States, and

2.  A preliminary and permanent injunction ordering Defendants Boughton, Kartmann and Brown to implement safety measures which would reasonably prevent an inmate hanging himself inside of the Alpha Unit rec areas, and

3.  A preliminary and permanent injunction ordering Defendant McCardle from dispensing or prescribing pharmaceutical drugs to inmates without apprising them of the risks and potential side effects of said drugs, and

4.  Granting Plaintiff Walker compensatory damages in the amount of $200,000 against each defendant, jointly and severally, and

5.  Granting Plaintiff Walker punitive damages in the amount of $100,000 against Defendant Hill, Wallace and McCardle, jointly and severally, and

6.  Granting Plaintiff Walker compensatory damages in the amount of $200,000 against Defendant John Doe Employer and Wisconsin Patient's Compensation Fund for pain, suffering and psychological harm.

7.  Plaintiff Walker seeks a jury trial on all matters triable by jury, and

8.  Plaintiff Walker also seeks recovery of costs to this suit, and

9.  Any additional relief this Court deems just, proper and equitable.


Respectfully Submitted,

Dated this _17th_ day of _april_, 2018.

_Marcellous L. Walker_
Marcellous L. Walker #296712


## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to the matters alleged on information and belief and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.


Executed at Boscobel, WI on this _17th_ day of _april_, 2018.

_Marcellous L. Walker_
Marcellous L. Walker #296712

Marcellous Walker,

        Plaintiff,

    vs.

Gary Boughton, Warden, Mark Kartmann,

Lebbeus Brown, Sergeant Wallace, Matthew

Scullion, Officer Hill, John and Jane Doe

Officers, Nurse McCardle, John Doe

Employer, Wisconsin Patient's Compensation

Fund,

        Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

**SUPPLEMENTAL
COMPLAINT**

Case No.:

---

      Plaintiff Marcellous Walker, pro se, submits this supplement to his complaint and alleges the following:

### IV.   EXHAUSTION OF LEGAL REMEDIES

124(b).      Plaintiff Walker filed a State Law Notice of Claim for his state law claims of negligence pursuant to Wis. Stats. 893.82(3) and sent via certified mail to the Office of the Attorney General, addressed at 114 East State capitol, Madison, Wisconsin 53707-7857. (See Exhibits C-038 and Exhibit C-039)

### V.   LEGAL CLAIMS

149.    Defendant Hill was negligent by failing to conduct a proper search of Plaintiff Walker's person prior to escorting him to Alpha Unit outside recreation - causing him pain, injury and near

death, constituting negligence under state law and violating his rights under the Wisconsin constitution.

150.    Defendants Wallace and Hill were negligent regarding Plaintiff Walker's health and safety when 1.) Walker requested to come in from outside recreation when he informed them that he was wet and cold and left him outside, and 2.) after Walker threatened to kill himself, did not reasonably respond - causing him pain, injury and near death, constituting negligence under state law and violating his rights under the Wisconsin constitution.

151.    John and Jane Doe Officers failed to supervise and monitor the Alpha Unit rec cages which resulted in Plaintiff Walker ascended the fence and hanging himself - causing him pain, injury and near death, constituting negligence under state law and violating his rights under the Wisconsin constitution.

152.    Defendants Boughton, Kartmann, Brown, John and Jane Doe Officers were negligent regarding Plaintiff Walker's safety by failing to have adequate training and tools in place which would have allowed first responders to quickly identify, direct and implement a timely intervention in Plaintiff Walker's suicide attempt in the Alpha Unit rec area – which caused him pain, suffering, injury and near death, constituting negligence under state law and violating his rights under the Wisconsin constitution.

Respectfully Submitted,

Dated this _15th_ day of _April_, 2018.

_Marcellous L. Walk_
Marcellous L. Walker #296712

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to the matters alleged on information and belief and as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at Boscobel, WI on this _15th_ day of _April_, 2018.

_Marcellous L. Walk_
Marcellous L. Walker #296712